**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

CHESTER KROM and DOROTHY MILLER, his
wife,

                         Plaintiffs,

        v.                                      1:21-cv-01050 (AMN/DJS)

SMITH & NEPHEW, INC.,

                         Defendant.

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **BASCH & KEEGAN, LLP** | **JOHN A. DEGASPERIS, ESQ.** |
| P.O. Box 4235 | |
| Kingston, New York 12402 | |
| _Attorneys for Plaintiffs_ | |
| **SWANSON, MARTIN & BELL, LLP** | **JOSHUA E. BIDZINSKI, ESQ.** |
| 330 North Wabash – Suite 3300 | |
| Chicago, Illinois 60611 | |
| 800 Market Street – Suite 2100 | **MEHWISH ASLAM, ESQ.** |
| Saint Louis, Missouri 63101 | |
| _Attorneys for Defendant_ | |
| **WEBSTER SZANYI LLP** | **THOMAS S. LANE, ESQ.** |
| 424 Main Street – Suite 1400 | |
| Buffalo, New York 14202 | |
| _Attorneys for Defendant_ | |

**Hon. Anne M. Nardacci, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

On February 5, 2021, Chester Krom ("Plaintiff") and his wife Dorothy Miller (together,

"Plaintiffs"), commenced this action against Smith & Nephew, Inc. ("Defendant") and Columbia

Memorial Hospital in New York State Supreme Court, alleging state law claims for products

liability and loss of consortium arising from the failure of a medical device manufactured by Defendant and implanted in Plaintiff on January 28, 2019.  Dkt. No. 2 ("Complaint").  Defendant removed this diversity action to federal court on September 22, 2021.  Dkt. No. 1.

Presently before the Court[1] are Defendant's Motions (i) to exclude opinions and testimony from Plaintiff's two expert witnesses, and (ii) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking dismissal of Plaintiffs' Complaint.  Dkt. No. 38 ("Daubert Motion"); Dkt. No. 39 ("Summary Judgment Motion").  Plaintiffs submitted responsive papers in opposition to each Motion and Defendant submitted reply papers in further support.  Dkt. Nos. 47-51; Dkt. Nos. 52-54.

For the reasons set forth below, Defendant's Motions are granted.

## II.    BACKGROUND[2]

### A.  The Parties

Plaintiffs are residents of Kingston, New York and, at all times relevant, have been married. Dkt. No. 1-1 at ¶¶ 1-2, 70-71.  Defendant is a medical device manufacturer with its principal place of business in Memphis, Tennessee.  Dkt. No. 1-1 at ¶¶ 3, 6.

### B.  Mr. Krom's Prior Medical History

Sometime in 1997, Plaintiff underwent a total hip arthroplasty to replace his left hip.  Dkt. No. 39-19 at ¶ 1.  In simple terms, this procedure generally involves installing an artificial socket into the pelvis and implanting a stem into the femur; a ball on top of this "femoral stem" can then

---

[1] This case was reassigned to the undersigned on January 18, 2023.  Dkt. No. 32.

[2] Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response.  The Court has also considered the parties' other submissions and attached exhibits.  *See generally* Dkt. Nos. 38-39, 47-54.

rotate within the socket.  Dkt. No. 39-3 at 5, 13:10-14:22.[3]

Plaintiff is over six feet tall and, at the time of this "primary" (*i.e.*, initial) hip surgery, was in his early fifties and weighed over 200 pounds.  Dkt. No. 39-2 at 30, 113:18.  As part of the surgery, Plaintiff had a femoral stem manufactured by Defendant implanted into his left femur.  Dkt. No. 39-19 at ¶ 2.  Following this left hip replacement, Plaintiff also had both his knees replaced by Doctor Louis DiGiovanni in or about 2005, as well as a lumbar spine surgery in or about 2015.  Dkt. No. 39-2 at 22, 81:2-14; *id.* at 23, 82:22-83:6, 84:22-85:15.

Over time, Plaintiff began to experience pain in his replaced left hip, including while walking and golfing.[4]  Dkt. No. 39-19 at ¶ 3.  He consulted with Dr. DiGiovanni in 2018.  *Id.* at ¶ 4.  Dr. DiGiovanni determined that Plaintiff's pain was likely due to the dissolution of bone ("osteolysis") within Plaintiff's left femur.  *Id.* at ¶ 5.  According to Dr. DiGiovanni, the osteolysis led to the loss of bone stock in the proximal portion of Plaintiff's femur, which could cause his femoral stem to loosen.  *Id.* at ¶¶ 5-6.  Plaintiff and Dr. DiGiovanni agreed to proceed with a "revision" hip surgery, wherein one or more previously implanted artificial components is removed and replaced.  *Id.* at ¶ 7.

### C.  Plaintiff's Surgery

On January 28, 2019, Dr. DiGiovanni performed a revision surgery on Plaintiff's left hip.  *Id.* at ¶ 8.  At the time of this surgery, Plaintiff was 73 years old and weighed approximately 334 pounds which, given his height, constituted a body mass index in excess of 44 and qualified him as "morbidly obese."  *Id.* at ¶ 9; Dkt. No. 50 at ¶ 9.  The prior femoral stem was easily removed,

---

[3] Citations to docket entries, including deposition transcripts, utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

[4] Plaintiff identified his other hobbies as bowling and gardening.  Dkt. No. 39-2 at 11, 34:18-24, 37:2-5.

apparently because the stem was indeed loose.  Dkt. No. 39-19 at ¶ 11.  In its place, Dr. DiGiovanni

installed a larger stem, also manufactured by Defendant.  *Id.* at ¶¶ 12-13.

### D.  Defendant's Product and Warnings

The femoral stem at issue in this case is a prescription medical device that is only available

for purchase through an order by a physician.  *Id.* at ¶ 23.  The particular model Dr. DiGiovanni

selected (from within Defendant's "Echelon" series) was his "go-to stem" for revision surgeries

and he had used it many times previously based on his assessment that it was robust, strong, and

"works well."  *Id.* at ¶ 19.  Dr. DiGiovanni opted for a stem size of 12 millimeters because he felt

it was the largest size he could safely implant into Plaintiff's femur.  *Id.* at ¶ 13.  Given the size of

Plaintiff's femur, Dr. DiGiovanni was concerned that using a larger stem risked splitting the bone.

*Id.*; Dkt. No. 39-3 at 26, 96:21-97:12.

Based on Defendant's internal records produced in discovery and relied upon by Plaintiffs

in their opposition to the Summary Judgment Motion, more than 6,300 stems of the relevant

Echelon model were sold from May 1997 through December 2018.  Dkt. No. 49 at ¶ 49; Dkt. No.

51-17 at 3, 6.  Sixteen of these devices had reported complaints due to a "break."  Dkt. No. 51-17

at 3.  Plaintiffs characterize this complaint rate of 0.253% as the "fracture rate" for the model.  Dkt.

No. 49 at ¶ 52; Dkt. No. 51-9 at ¶ 42.  Assuming Plaintiffs are correct, that suggests 99.747% of

the model's stems did not fracture during the approximately twenty-year period immediately prior

to Plaintiff's January 2019 surgery.

As relevant to that surgery, Plaintiff knew neither the manufacturer nor the product which

Dr. DiGiovanni planned to use.  Dkt. No. 39-19 at ¶ 16; Dkt. No. 50 at ¶ 14.  Plaintiff did not

conduct his own research and had no contact with Defendant.  Dkt. No. 39-19 at ¶¶ 15-16.  Plaintiff

also did not receive or review any written materials or information from Defendant regarding any

of Defendant's products prior to his surgery.  *Id.* at ¶ 14; Dkt. No. 50 at ¶ 14.  Plaintiff further testified that "[n]o one has ever given me anything written" and that he had "[n]ever seen a warranty or anything like that."  Dkt. No. 39-2 at 22, 80:13-24.

The stem Dr. DiGiovanni chose to implant in January 2019 was accompanied by Defendant's "Instructions for Use" document ("IFU").  Dkt. No. 39-19 at ¶ 24.  Defendant's "Surgical Technique" brochure was also available to Dr. DiGiovanni.  *Id.* at ¶ 30.  Both documents contained various warnings and identified various risks related to the use of an Echelon stem including, *inter alia,* contradictions for "[m]orbid obesity" and "multiple joint disabilities."  *Id.* at ¶¶ 25-29, 31.  In particular, the documents noted that "[i]n revision surgery, inadequate proximal implant support is contraindicated.  There is an increased risk of implant failure in revision cases where proximal support is not achieved, poor bone quality exists, and small sized implants are utilized."  *Id.* at ¶ 26.  The documents also noted that "[i]mplant loosening or fracture, particularly of smaller sized or high offset implants, is more likely to occur in patients who are young, physically active, and/or heavy, which may lead to implant failure and revision surgery."  *Id.* at ¶ 27.  The IFU further warned that "[s]tudies have indicated a higher risk of implant fatigue failure in cases with inadequate proximal bone stock."  *Id.* at ¶ 29.

Dr. DiGiovanni testified that he did not review either document in preparation for the January 2019 revision surgery, because "I already ought to know how to do the surgery."  *Id.* at ¶¶ 32-33.  Dr. DiGiovanni has been performing hip replacement surgeries since 1985 and performs an estimated one hundred such procedures a year, five to ten of which are revision surgeries.  *Id.* at ¶¶ 17-18.  Dr. DiGiovanni further testified that he was aware of the risks contained in these documents, separate and apart from any information he could have received from Defendant.  *Id.* at ¶ 34.  In particular, Dr. DiGiovanni knew that among Plaintiff's risk factors, his weight and

amount of proximal bone available increased the risk of stem fracture.  *Id.* at ¶¶ 20-21.  Finally, Dr. DiGiovanni testified that "I know of no femoral stem or know of no implant that you can put in a person that can't be broken. . . . I think [Plaintiff]'s is the only implant I've ever seen actually fracture, but the literature is just replete[,] absolutely every single femoral stem on the market has broken."  *Id.* at ¶ 76; Dkt. No. 39-3 at 8, 22:24-23:12.

### E.  Plaintiff's Injury

The January 2019 revision surgery initially seemed successful, as Plaintiff recovered and was able to ambulate well.  Dkt. No. 39-19 at ¶ 35.  In the summer of 2019, however, Plaintiff began experiencing pain in his left hip.  *Id.* at ¶ 36.  On August 15, 2019, he consulted with Dr. DiGiovanni and had his left hip x-rayed.  *Id.* at ¶ 37; Dkt. No. 39-16 at 4.  Sometime that night, Plaintiff's left stem fractured.  Dkt. No. 39-19 at ¶¶ 39-40.  He was transported to an emergency room the next morning, where another x-ray confirmed the fracture.  *Id.* at ¶ 40.

On August 22, 2019, Dr. DiGiovanni performed a second revision surgery on Plaintiff's left hip.  *Id.* at ¶ 41.  The proximal portion of the stem was loose and easily removed.  *Id.*

### F.  Plaintiffs' Allegations

The Complaint alleges four products liability claims under New York law against Defendant: (i) negligence, *see* Dkt. No. 2 at ¶¶ 23-31; (ii) strict products liability, *see id.* at ¶¶ 38-52; (iii) express breach of warranty, *see id.* at ¶¶ 53-60; and (iv) implied breach of warranty, *see id.* Each claim relies on the same basic allegations: Defendant's defective product fractured and caused Plaintiff injury.  Plaintiffs also assert a derivative claim under New York law for loss of consortium.  *Id.* at ¶¶ 69-75.

### G.  Procedural History

In February 2021, Plaintiffs commenced this action in New York State Supreme Court,

Ulster County, against Defendant and Columbia Memorial Hospital, which is the facility where Dr. DiGiovanni performed Plaintiff's January 2019 revision surgery. Dkt. No. 2. In July 2021, Plaintiffs filed a separate lawsuit against Dr. DiGiovanni, in New York State Supreme Court, Ulster County. Dkt. No. 39-9; Dkt. No. 39-19 at ¶ 45. In August 2021, Plaintiffs stipulated to the discontinuance of their claims against Columbia Memorial Hospital. Dkt. No. 1-3; Dkt. No. 39-19 at ¶ 44. In September 2021, Defendant removed this action to federal court, on the basis that the remaining parties were diverse and the amount in controversy requirement had recently been satisfied by a recent settlement demand from Plaintiffs.[5] Dkt. No. 1 at ¶¶ 5-6; 28 U.S.C. § 1332.

### H. Challenged Expert Opinions

Defendant's Daubert Motion challenges testimony from Plaintiff's two disclosed experts: Rong Yuan, Ph.D., P.E., and Jason Patrick Hochfelder, M.D.

### 1. Dr. Yuan's Opinions

Dr. Yuan is a mechanical engineer and has a Ph.D. in material science. Dkt. No. 39-19 at ¶ 54. Dr. Yuan examined the fractured Echelon stem in November 2020, more than three years prior to her latest expert report. Dkt. No. 38-3 at 5.

In her June 16, 2023 report, Dr. Yuan opined that (i) Defendant's 12-millimeter Echelon stem does not satisfy certain standards (her "industry standards" opinion); and (ii) Defendant failed to provide adequate warnings to surgeons utilizing Echelon stems regarding the weight limits for such stems (her "warning defect" opinion). Dkt. No. 38-3 at 20-21; Dkt. No. 50 at ¶ 61. Related to her first opinion, Dr. Yuan also stated that, because the stems allegedly do not meet certain

---

[5] The Complaint itself did not specify a particular numerical value for damages, presumably because of New York law. *See* N.Y. C.P.L.R. § 3017(c) ("In an action to recover damages for personal injuries or wrongful death, the complaint, counterclaim, cross-claim, interpleader complaint, and third party complaint shall contain a prayer for general relief *but shall not state the amount of damages to which the pleader deems himself entitled.*") (emphasis added).

industry standards, Defendant's 1998 and 2002 "510(k)"[6] submissions "deceived" the United States Food and Drug Administration ("FDA") and were "misleading the FDA." Dkt. No. 38-3 at 14, 21.

During her August 23, 2023 deposition, Dr. Yuan acknowledged that her June 16, 2023 report was her "final report in this case," that it "contain[ed] all the conclusions and opinions [she] intend[s] to offer at trial," that it was "not missing any opinions," that she had no "new opinions" since the report, that she was prepared to testify regarding the "full and final opinions" in her report,[7] and that she had "done all the work necessary to render [her] opinions." Dkt. No. 38-14 at 4, 7:20-8:25.

At her deposition, Dr. Yuan testified that that she had no opinion regarding whether the Echelon stem at issue had a manufacturing defect. *Id.* at 15, 50:11-51:7. Dr. Yuan also testified that she had no opinion regarding whether the Echelon stem at issue had a design defect. *Id.* at 34, 128:17-23. Dr. Yuan further testified that her opinions did not relate to the design of the Echelon stem, but rather the information included therewith. *Id.* at 17, 60:9-20.

---

[6] Generally, a "510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is as safe and effective, that is, substantially equivalent, to a legally marketed device." U.S. F.D.A., Premarket Notification 510(k), https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/premarket-notification-510k (last visited July 11, 2024); *see also Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 56 (2d Cir. 2016) ("Under the § 510(k) process, a party seeking to market a [medical] device must submit a 'premarket notification' to the FDA, which must include a description of the device, a statement of intended use, the proposed labeling, and any other information necessary for the FDA to determine if the device is 'substantially equivalent' to an existing authorized device. A determination that the new device is substantially equivalent to a preexisting device is essentially a finding that the new device is as safe and effective as the preexisting device, meaning the new device may be marketed without further analysis.") (citation omitted).

[7] More than two months after Defendant filed the Motions, Plaintiffs nonetheless submitted an additional report from Dr. Yuan. *See* Dkt. No. 51-9. While this report is improper as discussed below, *see* Section IV.B.2 n.13, *infra*, the Court need not address the report here given Plaintiff's assertion that Dr. Yuan's two opinions remain unchanged. *See* Dkt. No. 50 at ¶ 61.

As to her warning defect opinion, Dr. Yuan testified that "[t]he defect is like [Defendant] already know [sic] the load limit for the device at a different size, but they did not give the information to the doctors.  That should be included as part of the product specification, but they failed to do that. . . . That's the defect."  *Id.* at 14, 49:23-50:4.  Dr. Yuan further opined that, based on her prior experience at a technology company, this information should have been included in a "kind of like semi-secret" chart to doctors.  *Id.* at 27, 101:18-102:19.  When asked, she did not know whether any other medical device manufacturer provided such a chart.  *Id.* at 101:18-24; *id.* at 28, 103:10-18.  And because she did not "know how the procedure is done" or what concerns doctors might have, she did not "know if other information should be provided" in her proposed chart.  *Id*. at 28, 103:19-104:9.

As to her opinion regarding so-called industry standards, Dr. Yuan testified that she did not know whether the FDA required manufacturers to test femoral stems to the particular International Organization for Standardization ("ISO") standard she had identified.  Dkt. No. 38-14 at 15, 51:8-53:1.  Based on her experience with non-ISO standards in the lithium-ion battery industry, however, she nonetheless "believe[d]" that medical device manufacturers tested to this particular ISO standard.  *Id.* at 15, 51:25-53:1.  Finally, when asked whether her industry standards opinion meant that Defendant's femoral stems were defective, Dr. Yuan responded: "No.  Not defective.  But the -- the point that you [sic] have to specify in the product specification, these are not for the previously designed average patient body weight.  You need to specify that.  That's required."  *Id.* at 53:23-54:3.

Finally, Dr. Yuan also reiterated her belief that Defendant "is even worse because they purposefully cheated [the] FDA."  *Id.* at 16, 57:21-24.  When asked to clarify the issue, she did so as follows:

Q:  So okay.  So this information was provided, these load values, the 30 ksi and the 35 ksi, those were contained in the 510(k)-document submitted to the FDA; right?

A:  Yes.

Q:  Okay.  So just like you were able to read through it and see the 30 ksi and the 35 ksi, presumably, somebody at the FDA would have been able to read through it and see the exact same thing; right?

A:  You have to be very careful because I believe -- because I -- let me see.  I can show you how small it is.  I don't know if anyone would pay attention to it.

Q:  Well, you did; right?

A:  Yes, because I'm excellent.

Q:  Well, that's fine.

A:  No. I'm kidding.  No. I -- I did pay attention, but FDA, I have to say, maybe they miss the information.  But I just show you how small it is.  Let me see on the page number.  I'm going to see the page number, it is -- page number is 312. Let me see.  Yeah.  Sorry.  You have -- it seems like you have to really understand the mechanical [engineer] and then this table make -- make sense to you.  If you are not like a mechanical engineer[], you will miss all the detail, because this seems like unreasonable to you.  Here.  It is only this small.  This small piece.  I will show you how small it is.  People will miss it if they don't like -- if they don't know the mechanical engineering.  Here.

Q:  Okay.  But, I mean, aren't we sort of assuming that the FDA didn't know mechanical engineering?  We probably can't make that assumption; right?

A:  We cannot make that assumption.  But if you -- if you are not a mechanical engineering, you -- you -- I think you are going to miss it.  Because that's the information, material strength 30,000 ks -- 30,000 psi translated to 30,000[] ks -- 30 ksi. So you can see here, that's the information.  If -- if you are not a mechanical [engineer], you even won't see the detail.  You are going to only read the report because these are the attached, the calculation.

Q:  But they were provided to the FDA.

A:  Yes.

*Id.* at 32, 121:19-123:11.

### 2. Dr. Hochfelder

The record before the Court does not contain an expert report from Dr. Hochfelder. Plaintiffs have stated that Dr. Hochfelder is a "damages-only witness only [sic], and he does not offer any opinion regarding product defect." Dkt. No. 50 at ¶ 47. Plaintiffs' February 28, 2023 expert witness disclosure of Dr. Hochfelder included a summary—from counsel and without Dr. Hochfelder's signature—of Dr. Hochfelder's anticipated trial testimony. Dkt. No. 38-5. Plaintiffs' counsel states that Dr. Hochfelder will primarily provide expert opinions regarding Plaintiff's medical history, including surgeries and recovery therefrom. *Id.* at 2-3.

## III.    STANDARD OF REVIEW

### A. Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). While district courts perform a "gatekeeping role" to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *Daubert*, 509 U.S. at 597, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *U.S. v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020) (quoting *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)).[8]

Rule 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;

---

[8] Given the particular facts of this case, the Court need not address the significance, if any, of the 2023 amendment to Rule 702 in light of this Circuit's controlling precedent.

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods
to the facts of the case.

Fed. R. Evid. 702.

The Second Circuit has interpreted Rule 702 to require that the district court first determine whether a proposed expert is qualified to provide an opinion, before then assessing the reliability and relevance of the expert's proffered testimony. *See, e.g., Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016) (summary order) ("As a threshold matter, trial courts must consider whether the witness is qualified . . . before reaching an analysis of the testimony itself."); *Nimely*, 414 F.3d at 396-97 ("[A]fter determining that a witness is 'qualified as an expert' to testify as to a particular matter . . . and that the opinion is based upon reliable data and methodology, Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'") (citations omitted); *see also Faison-Williams v. United States*, No. 20-cv-08329, 2024 WL 1195033, at *8 (S.D.N.Y. Mar. 20, 2024).

**B. Summary Judgment**

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4

(N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.   DISCUSSION

### A. Daubert Motion

#### 1.  Dr. Yuan's Opinions

Defendant argues that Dr. Yuan's opinions should be excluded because: (i) she is not qualified to offer any opinion in this case; (ii) she used unreliable methods; and (iii) her opinions are disconnected from the facts of this case. Dkt. No. 38-19 at 10-17. Defendant further argues that Dr. Yuan's assertion that Defendant "purposefully cheated [the] FDA" should be excluded because she is not qualified to offer such testimony and, even if she were qualified, such testimony

13

would be improper. *Id.* at 17-18. In response, Plaintiffs argue that Dr. Yuan (i) is qualified, primarily by experience; (ii) used reliable methods; and (iii) her FDA testimony is, additionally, relevant. Dkt. No. 47 at 15-21.

### i.   Dr. Yuan's qualifications

Dr. Yuan obtained her bachelor's degree, master's degree, and Ph.D. in materials science and engineering, *see* Dkt. No. 38-4 at 3, and is a licensed professional engineer in Arizona and California, *see* Dkt. No. 38-14 at 6, 16:23-17:10. She has worked for approximately nine years as a litigation consultant, *see* Dkt. No. 38-14 at 12, 39:2-21, and also previously worked for approximately eight years as an engineer at a technology company, *see* Dkt. No. 38-4 at 4. Dr. Yuan is not a biomechanical engineer, nor a medical doctor. Dkt. No. 38-14 at 6, 17:11-14. She has not attended medical school, has no medical training, and has no medical background. *Id.* at 17:15-18; *id.* at 18, 65:13. She has never designed a femoral stem component, or any other medical device component. Dkt. No. 39-19 at ¶ 55. She has never prepared warnings for a femoral stem component, nor is there evidence in the record that she has prepared warnings for any medical device. *Id.* at ¶ 56. She has never implanted a medical device or observed a medical device being implanted. Dkt. No. 38-14 at 8, 25:18-22.

Dr. Yuan has never worked for a medical device company, for the FDA, or for any other agency that regulates medical devices. Dkt. No. 39-19 at ¶ 57. She has never submitted or assisted in submitting a 510(k) premarket notification to the FDA. Dkt. No. 38-14 at 8, 22:9-14. At her deposition, she did not know the difference between FDA clearance following 510(k) premarket notification and FDA premarket approval ("PMA").[9] *Id.* at 22:15-18. She was also unfamiliar

---

[9] *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 112 (2d Cir. 2006) ("As the contrasting terms 'premarket notification' and 'premarket approval' suggest, the § 510(k) process differs dramatically from the PMA process. Unlike the PMA process—which requires reasonable assurance that the new device

with regulations governing medical device labeling.  *Id.* at 31, 115:15-23, 116:20-24.

Dr. Yuan has never taught any courses related to medical devices.  *Id.* at 9, 26:23-25.  She has never authored any peer-reviewed articles related to medical devices.  *Id.* at 20, 71:11-15.  Dr. Yuan has never previously testified in a case involving a medical device.  *Id.* at 9, 29:12-14.  While the hundreds of cases on which she has worked during her approximately nine years as a litigation consultant "include over 500 lithium-ion battery failures," only one of her prior cases involved a medical device (a pacemaker's battery failure).  *Id.* at 12, 39:4-21; *id.* at 9, 29:15-25; Dkt. No. 38-4 at 3.  When asked about her professional experience with medical device warnings, Dr. Yuan suggested she had analogous experience based on her participation on a team within a technology company that worked on an internal and non-medical project:

Q:  Have you ever prepared any warnings for a hip stem component?

A:  Not warnings about hip stem [but] because I worked at Intel, I provided a warning for the test machine I designed.

Q:  For, I'm sorry, what kind of machine?

A:  It's a -- Intel has a -- has lots of engineers.  Sometime[s], we design our own machine to do testing.  So I was once in the test group; we designed our own test equipment, just for Intel internal use. . . .

Q:  Okay.  So what you're telling us is you helped prepare some warnings for a machine that was used internally at Intel?

A:  Yes.

Q:  Okay.  What was that machine used for?

---

is itself safe and effective, and ultimately results in the FDA's 'approval' of the device—the § 510(k) process simply requires the manufacturer to show that the device is substantially equivalent to, *i.e.,* as safe and effective as, a legally marketed device that did not go through the PMA process."); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 478-79 (1996) ("The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in an average of only 20 hours.").

A:  For test [sic].  Because at Intel, we produce the chip side and the CPU.  So once you have the product out, we need to do internally to do electrical testing. . . . And the -- so after the -- the components was made [sic], and then gave [sic] to the Intel internal factory to use, you need to remind the worker, train the worker, remind them how to use it, how to be careful about if they are going to hurt you or not [sic].

Q:  What was the testing machine; what was it used to test?

A:  It is a socket, a component in electrical testing.  Because when you have a chip side, you need to place it into a socket, apply load, press it, and then you run electrical current to test that the chip side.  The performance --

Q:  You're talking about like a computer chip?

A:  Yes.

Q:  Okay.  Got it.  And so the machine that you're talking about tested computer chips?

A:  Yes.

Dkt. No. 38-14 at 7, 20:1-21:19.

Finally, Plaintiffs have conceded that "[Dr.] Yuan is not an orthopedic surgeon, and thus she cannot comment outside of her field" regarding what factors doctors consider when selecting a femoral stem.  Dkt. No. 50 at ¶ 70; Dkt. No. 39-19 at ¶ 70.

Based on this record, the Court finds that Dr. Yuan is not qualified by experience, knowledge, skill, training, or education to offer any opinion regarding the medical device at issue in this case.  *Cf. Doe v. Am. Med. Sys., Inc.*, 96 F. App'x 758, 759 (2d Cir. 2004) (summary order) (affirming district court's exclusion of plaintiffs' proffered expert as unqualified) ("Although [the expert] has substantial engineering credentials, he is not an expert in [a particular medical device] or similar devices.  His involvement with [a particular medical device] almost exclusively consists of his work as an expert witness.  His formal medical training is limited to seminars addressing medical topics and three courses taken while pursuing his engineering degree.").  Accordingly, the Court grants the Daubert Motion as to Dr. Yuan's opinions.

ii.       **Reliability of Dr. Yuan's opinions**

Even if Dr. Yuan could be qualified to offer opinions in this case, the Court finds the methods underlying her industry standards and warning defect opinions to be unreliable.  To the extent her methodology was described, it appears to consist primarily of speculation based on her personal and non-medical device experience.  *See, e.g., Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (stating that under *Daubert*, "[a]n expert's opinions that are without factual basis and are based on speculation or conjecture are [ ] inappropriate material for consideration on a motion for summary judgment").

As detailed above, *see* Section II.H.1, *supra*, Dr. Yuan offered no relevant factual basis for her opinions.   She expressed no knowledge regarding the practices of medical device manufacturers. Dkt. No. 38-14 at 27, 101:18-24; *id.* at 28, 103:10-18.  She relied on her litigation consulting experience with battery manufacturers and her prior experience within a technology company to opine about standards purportedly applicable to the medical device industry.  *Id.* at 15, 51:25-53:18.  She also relied on her prior experience within a technology company to opine about medical device labels.  *Id.* at 7, 20:1-21:19.

As another example, Dr. Yuan relied on her personal experience with a family member's heart surgery to speculate about how Defendant should have provided information to Dr. DiGiovanni prior to Plaintiff's revision hip surgery:

> Q:  Okay.  So getting back to my original question, in what format -- I mean, and how [is] a manufacturer supposed to go about getting this information to the doctors in your opinion?
>
> A:  In my opinion, it's like I believe that when a doctor do any kind of surgery they need to talk to the manufacturer before it.   And then they discuss with the manufacturer's sales representative, and the sales representative should ask the detailed information [sic], like, "What's your patient body weight?"  And then, they have that information, they can say, "I would recommend you to use" [sic] -- even if they don't provide it, that chart, the sales [sic] can say, "Okay.  I recommend you

to use this size [sic], this -- this family -- this product family.  And because your patient is overweighted [sic]."  And the -- and then my -- the doctor might say, "Okay.  I do want that one."  And then, they can go back, you know, okay, I'm going to talk to the engineering team to see if we can find a solution for you.

. . . .

A:  I think this is a normal procedure.  Because my father just had a surgery on stent [sic], and then the doctor told me that he -- he talked -- he discussed all the information with the manufacturer and the -- about the surgery before.  And then the doctor explained it to me clearly how he would do the surgery, where the location is.  Because I'm engineer [sic], I even asked which manufacturer, what material.  I even go back search the literature to read the failure and the such details [sic].  So -- so I know based on my father's surgery the doctor needs to talk to a sales representative before the surgery.

Q:  Okay.  So you're assuming that's what happened here?

A:  Yes.

Q:  Do you have any idea what the substance of that conversation was?

A:  I -- I don't know because it's a different surgery.  But for my father's surgery, I know what happened.

Q:  Right.  I know.  But we're talking about this surgery here; right?  Okay.

A:  I don't know.

*Id.* at 27, 98:6-99:2, 99:17-100:15.

As a further example, Dr. Yuan testified during her deposition that she had not actually performed any calculations or testing to support her industry standards opinion.  *Id.* at 14, 48:17-49:7.  As to her related "misleading the FDA" statements, these were based on her speculation that the FDA could have missed certain information included in Defendant's 501(k) submissions because the information was "small."  *Id.* at 32, 121:19-123:11.

For all these reasons, the Court finds that Dr. Yuan's methods in this case are unreliable.[10] *Salvino*, 542 F.3d at 311.  Accordingly, the Court also grants the Daubert Motion as to Dr. Yuan's opinions on this ground.

### 2. Dr. Hochfelder's Opinions

Defendant argues that because Plaintiffs have not satisfied the expert discovery requirements set forth in Rule 26(a) of the Federal Rules of Civil Procedure, any of Dr. Hochfelder's opinions should be excluded pursuant to Rule 37(c)(1).  Dkt. No. 38-19 at 19-21. Plaintiffs do not respond to this argument in their opposition.  *See generally* Dkt. No. 47. Accordingly, the Court finds that Plaintiffs have conceded this argument.  *See, e.g., Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.*, 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022) ("A party may be deemed to concede an argument by failing to address it in an opposition brief.") (citation omitted).

However, the summary of Dr. Hochfelder's proposed testimony is not cited by Plaintiffs in their opposition to the Summary Judgment Motion. *See generally* Dkt. No. 48.  Because addressing Dr. Hochfelder's proposed testimony is irrelevant to the resolution of the Summary Judgment Motion—and unnecessary in light of the Court's decision therein—the Court denies the Daubert Motion as to Dr. Hochfelder's opinions as moot.

### B.  Summary Judgment Motion

The Court agrees with the parties that New York's substantive law applies to the Summary Judgment Motion in this diversity action.  *See, e.g.,* Dkt. No. 39-20 at 13, 18, 22; 29-30; Dkt. No. 48 at 8-10; *see also Sarkees v. E.I. Dupont De Nemours & Co.*, 15 F.4th 584, 588 (2d Cir. 2021)

---

[10] Because the Court has determined that Dr. Yuan is not qualified to testify as an expert in this matter and that her opinions are the result of unreliable methodology, it does not reach the final relevance inquiry under Rule 702.  *See, e.g., Nimely*, 414 F.3d at 397.

("In a diversity of citizenship case, state law, here New York's, applies to substantive issues, and federal law applies to procedural issues.") (citation omitted).

Under New York law, "a plaintiff can assert claims for injury due to an allegedly defective product under theories of negligence, strict products liability, and breach of express or implied warranty." *Delgado v. Universal Beauty Prods., Inc.*, No. 22-2727-cv, 2024 WL 1298509, at *1 (2d Cir. Mar. 27, 2024) (citing *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106 (1983)) (summary order); *Monell v. Scooter Store, Ltd.*, 895 F. Supp.2d 398, 410 (N.D.N.Y. 2012) (same). Under each theory, "the plaintiff is required to show that the defectively designed product caused [his] injury and that the defect was the proximate cause of the injury." *Delgado*, 2024 WL 1298509, at *1 (citations omitted). As for the nature of the defect, a product can be defective due to: "(1) a manufacturing defect, which results when a mistake in the manufacturing renders a product that is ordinarily safe dangerous so that it causes harm; (2) a warning defect, which occurs when the inadequacy or failure to warn of a reasonably foreseeable risk accompanying a product causes harm; and (3) a design defect, which results when the product as designed is unreasonably dangerous for its intended use." *McCarthy v. Olin Corp.*, 119 F.3d 148, 154-55 (2d Cir. 1997) (citations omitted); *see also Hayes v. Smith & Wesson*, 692 F. App'x 70, 71 (2d. Cir. 2017) (summary order); *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 (1998).

### 1. Summary judgment due to preclusion of expert testimony

In general, for products liability claims under New York law, a "plaintiff is 'required to produce expert opinion evidence based on suitable hypotheses in order to support a finding of causation' when the case involves issues beyond the knowledge of a layperson." *Sura v. Zimmer, Inc.*, 768 F. App'x 58, 59 (2d Cir. 2019) (summary order) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002)); *see also Tomaselli v. New York &*

*Presbyterian Hospital*, 728 F. App'x 41 (2d Cir. 2018) (summary order).  The Court finds that determining the cause of Plaintiff's femoral stem fracture following revision surgery is beyond the knowledge of a layperson, and thus expert testimony is required.

As detailed previously, Plaintiffs have failed to present any admissible expert testimony in this case.[11]  Because Plaintiffs have not satisfied their burden, the Court grants the Summary Judgment Motion in its entirety.  *See, e.g., In re Mirena IUD Prods. Liab. Litig.*, 202 F. Supp. 3d 304, 311-12 (S.D.N.Y. 2016) (granting summary judgment in favor of, *inter alia*, defendant manufacturer following exclusion of testimony from plaintiff's experts) ("[C]ases involving pharmaceuticals, toxins or medical devices involve complex questions of medical causation beyond the understanding of a lay person" and thus "summary judgment is appropriate where required expert testimony is absent from the record.") (citations omitted), *aff'd*, 713 F. App'x. 11 (2d Cir. 2017) (summary order); *Pinello v. Andreas Stihl Ag & Co. KG*, No. 08-cv-00452, 2011 WL 1302223, at *10 (N.D.N.Y. Mar. 31, 2011) ("[W]here a plaintiff's expert's opinion and testimony in a product liability action is precluded, plaintiff's liability theories are no longer viable and summary judgment is appropriate.") (collecting cases); *see also Hamraz v. Diversified Maint. Sys., LLC*, No. 18-cv-01864, 2023 WL 5200282, at *9 & n.9 (E.D.N.Y. Aug. 14, 2023) (granting defendant's summary judgment motion and dismissing derivative claims).

Even if Dr. Yuan's testimony were admissible, the Court nevertheless finds that the Summary Judgment Motion should be granted for the reasons that follow.

---

[11] Plaintiffs rely exclusively on Dr. Yuan's proposed expert testimony and have not presented a circumstantial evidence argument.  *Compare Delgado*, 2024 WL 1298509, at *2.

### 2. Plaintiffs' negligence and strict products liability claims

Based on the fracture of Defendant's femoral stem within Plaintiff, the Complaint asserts claims for negligence and strict products liability,[12] each claim relying on conclusory allegations of manufacturing, design, and warning defects. Dkt. No. 2 at ¶¶ 27, 41-44. Defendant moves for summary judgment on both claims, as to all three theories of alleged defect. Dkt. No. 39-20 at 14-25. Defendant's primary argument, addressed immediately above, is that Plaintiffs lacked admissible expert testimony to prove their claims. Dkt. No. 39-20 at 12-13. Defendant also argues that: (i) there is no evidence of a manufacturing defect and, even if there were, Plaintiffs have not shown that such a defect caused Plaintiff's injury, *see id.* at 14-17; (ii) Plaintiffs have not identified a design defect and, even if they had, they have not demonstrated the existence of a feasible alternative design, *see id.* at 17-21 and Dkt. No. 54 at 6-8; and (iii) Plaintiffs' failure to warn claim is not viable because Defendant's documentation included adequate warnings, Dr. DiGiovanni was an informed intermediary, and, in any event, there was no causation given that Dr. DiGiovanni did not review any warnings provided by Defendant, *see* Dkt. No. 39-20 at 21-25 & Dkt. No. 54 at 8-11.

Plaintiffs argue in opposition that they only "allege a failure to warn under theories of negligence and strict product liability." Dkt. No. 48 at 9. Accordingly, the Court deems Plaintiffs' products liability claims based on manufacturing and design[13] defects abandoned and grants the

---

[12] The Court analyses these two claims together, consistent with the parties' arguments. *See Beechler v. Kill Bros. Co.*, 170 A.D.3d 1606, 1608 (4th Dep't 2019) (noting that "there is almost no difference between a prima facie case in negligence and one in strict liability") (quoting *Preston v Peter Luger Enters.*, 51 A.D.3d 1322, 1325 (3d Dep't 2008)); *see also Maxwell v. Howmedica Osteonics Corp.*, 713 F. Supp. 2d 84, 90 n.8 (N.D.N.Y. 2010) (analyzing negligence and strict products liability claims together).

[13] To the extent Plaintiffs' opposition could be read to argue in the alternative that a design defect theory—distinct from the warning defect theory addressed below—should proceed, *see* Dkt. No. 48, 17-19, such an argument fails. Plaintiffs rely on Dr. Yuan's most recent late report, which

corresponding portions of the Summary Judgment Motion.  *See, e.g., Jackson v. Fed. Exp.*, 766

F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be

denied as to some claims while not mentioning others may be deemed an abandonment of the

unmentioned claims.").   As to their negligence and strict products liability claims based on a

warning defect, Plaintiffs primarily argue that assessing such claims is a fact-intensive inquiry not

appropriate for summary judgment, *see* Dkt. No. 48 at 9-13; that the warnings in Defendant's

documentation were not sufficiently absolute to be adequate as a matter of law, *see id.* at 11-13;

that another warning, namely the "semi-secret" chart proposed by Dr. Yuan, should have been

provided instead, *see id.* at 13-15 & Dkt. No. 38-14 at 27, 101:18-102:19; and that Defendant's

caselaw is distinguishable, *see* Dkt. No. 48 at 15-17.

        "To succeed on a failure to warn claim, Plaintiffs must establish that: (1) the manufacturer

had a duty to warn; (2) the plaintiff used the product in a reasonably foreseeable manner; and (3)

the failure to warn was the cause of the plaintiff's injury."  *Hunter v. Shanghai Huangzhou Elec.*

*Appliance Mfg. Co.,* 505 F. Supp. 3d 137, 155 (N.D.N.Y. 2020) (citing *Monell*, 895 F. Supp. 2d at

413).  Further, because this case involves a prescription medical device, New York's "informed

---

explicitly states that it "was created in response to [Defendant]'s instant Motion for Summary
Judgment."  Dkt. No. 51-9 at ¶ 14.  However, Dr. Yuan previously testified—definitively, *see*
Section II.H.1, *supra*—that she was not offering a design defect opinion and Plaintiffs have
represented that Dr. Yuan's opinions remain unchanged since her deposition.  Dkt. No. 50 at ¶ 61.
Accordingly, the Court disregards as a sham issue of fact any contrary opinion(s) subsequently
offered to defeat summary judgment.  *See, e.g., In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189,
193 (2d Cir. 2013) ("[W]e hold that the District Court was entitled to disregard [the expert]'s new
testimony relating to his knowledge based on the 'sham issue of fact' doctrine, which prohibits a
party from defeating summary judgment simply by submitting an affidavit that contradicts the
party's previous sworn testimony.") (citation omitted); *see also Perma Rsch. & Dev. Co. v. Singer
Co.*, 410 F.2d 572, 578 (2d Cir. 1969) (observing that if a person "who has been examined at length
on deposition could raise an issue of fact simply by submitting an affidavit contradicting [her] own
prior testimony, this would greatly diminish the utility of summary judgment as a procedure for
screening out sham issues of fact").

intermediary" doctrine also applies.  *See, e.g., Martin v. Hacker*, 83 N.Y.2d 1, 9 (1993).  Under this doctrine:

> Warnings are furnished to the medical community as the 'informed intermediary' between the manufacturer and the patient.  [T]he physician's function is to evaluate a patient's needs, assess the risks and benefits of available [products] and then prescribe a [product], advising the patient of its risks and possible side effects.  Thus, the manufacturer's liability, if any, is directly related to the adequacy of the warning provided.  If the doctor is sufficiently warned, the product is not defective.

*Fane v. Zimmer, Inc.*, 927 F.2d 124, 129 (2d Cir. 1991) (alterations in original) (citations and quotations omitted).

Assuming arguendo that Plaintiffs have proven the existence of a failure to warn defect, the Court finds that Plaintiffs have failed to establish that such a defect caused Plaintiff's injury.  *Hunter*, 505 F. Supp. 3d at 155.  Contrary to Plaintiffs' arguments otherwise, the Second Circuit's analysis in *Tomaselli* is instructive.  There, the Second Circuit found that a district court had properly granted summary judgment on the plaintiffs' products liability claims related to an implanted medical device because the plaintiffs had failed to establish causation.  In assessing the plaintiffs' claims based on a failure to warn defect, the Second Circuit reasoned as follows:

> the evidence demonstrates that while [plaintiff]'s doctor never saw the specific prepackaged warning indicating that the cables could break, he nevertheless knew that cables in implant devices could break after implantation.  For example, he testified that "every orthopedic surgeon knows" about cable fatigue strength and that "any cable could break with enough stress."  Because [defendant manufacturer] provided warnings describing that the [medical] device's cables could break, and because [plaintiff]'s physician was aware that cables used in implant devices can break, the plaintiffs' strict liability claims against the defendants fail under the informed intermediary doctrine.  For the same reasons, the plaintiffs' negligence claims fail as well.

728 F. App'x at *43 (citations omitted).

The factual record here is identical in key respects.  Prior to implanting Defendant's femoral stem, Dr. DiGiovanni did not review Defendant's IFU and Surgical Technique documents,

both of which contained numerous warnings related to the risk of stem fracture.  Dkt. No. 39-19 at ¶¶ 25-29, 32.  Separate and apart from these warnings, Dr. DiGiovanni nevertheless knew the risks contained in these documents based on his decades of experience implanting femoral stems. *Id.* at ¶¶ 17-18, 32-34.  He was also aware of risk factors specifically applicable to Plaintiff, including Plaintiff's weight and amount of proximal bone available.  *Id.* at ¶¶ 20-21.  Dr. DiGiovanni further testified that "I know of no femoral stem or know of no implant that you can put in a person that can't be broken. . . . the literature is just replete[,] absolutely every single femoral stem on the market has broken." *Id.* at ¶ 76; Dkt. No. 39-3 at 8, 22:24-23:12.

The Court finds that Dr. DiGiovanni was an informed intermediary, and that he was sufficiently warned.  *Fane*, 927 F.2d at 129.  Because Defendant provided warnings describing that the femoral stem could fracture and because Dr. DiGiovanni was aware that the femoral stem could fracture, Plaintiffs' remaining strict liability and negligence claims against Defendant fail due to lack of causation.  *Tomaselli*, 728 F. App'x at *43; *see also Fane*, 927 F.2d at 130 ("Because the warnings provided specific information on the risks associated with use of the [medical] device and [the surgeon] was fully aware of these risks, we hold as a matter of law that the warnings were adequate.").

Accordingly, the Court grants the Summary Judgment Motion as to these claims.[14]

---

[14] The Complaint includes a one paragraph *res ipsa loquitor* allegation within its negligence claim. Dkt. No. 2 at ¶ 31.  Defendant argues that *res ipsa loquitor* does not apply to the facts of this case. Dkt. No. 39-20 at 28-30.  Because Plaintiffs do not address the applicability of this doctrine in their opposition, *see generally* Dkt. No. 48, the Court deems this subset of Plaintiffs' negligence claim abandoned and also grants this portion of the Summary Judgment Motion.  *See Jackson*, 766 F.3d at 195.

### 3. Plaintiffs' breach of warranty claims

The Complaint asserts a single cause of action for "breach of warranty, express and implied" against Defendant, again based upon the fracture of Defendant's femoral stem within Plaintiff. Dkt. No. 2 at ¶¶ 53-60. Defendant moved for summary judgment on these breach of warranty claims, arguing that (i) there is no evidence of an express warranty conveyed to—or relied upon by—Plaintiffs; (ii) there is no evidence of an implied warranty; and (iii) even if there were evidence of either warranty, Plaintiff has failed to establish that the stem was actually defective. Dkt. No. 39-20 at 25-28. The Court notes that prior to his surgery, Plaintiff had no contact with Defendant, received no information from Defendant, and was unaware of any warranty by Defendant. *See* Section II.D, *supra*. In their opposition, Plaintiffs do not address the continued viability of their breach of warranty claims given this factual record. *See generally*, Dkt. No. 48. Accordingly, the Court deems Plaintiffs' breach of warranty claims abandoned and grants this portion of the Summary Judgment Motion. *See Jackson*, 766 F.3d at 195.

### 4. Derivative claim

Based on Plaintiff's injuries resulting from the fracture of his femoral stem, Plaintiffs assert a derivative claim for loss of consortium. Dkt. No. 2 at ¶¶ 69-75. Defendant moved for summary judgment on this claim, arguing that it should be dismissed because none of Plaintiff's underlying claims are viable. Dkt. No. 39-20 at 7 n.1. Plaintiffs also do not address this argument in their opposition. *See generally* Dkt. No. 48. Accordingly, the Court deems Plaintiffs' derivative claim abandoned and grants this portion of the Summary Judgment Motion. *See Jackson*, 766 F.3d at 195; *see also Griffin v. Garratt-Calahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996) (affirming district court's granting of defendant's summary judgment motion) ("We also hold that, since none of

26

[plaintiff husband]'s claims survive, [plaintiff wife]'s derivative claims alleging loss of consortium must also be dismissed."); *Hamraz*, 2023 WL 5200282, at *9 n.9.

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's Daubert Motion, Dkt. No. 38, is **GRANTED in part and DENIED in part**, as set forth in Section IV.A of this Memorandum-Decision and Order; and the Court further

**ORDERS** that Defendant's Summary Judgment Motion, Dkt. No. 39, is **GRANTED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 11, 2024
      Albany, New York

Anne M. Nardacci
U.S. District Judge